**DAVIS v. HASLAM LUMBER
CO., Inc., et al.
No. 4481.**

Court of Civil Appeals of Texas. Beaumont.
July 15, 1948.

Rehearing Denied Sept. 29, 1948.

Lane & Anderson, of Center, for plaintiff in error.

Collins, Dies, Williams & Garrison, of Lufkin, and McLeroy & McLeroy, of Center, Texas, for defendants in error.

WALKER, Justice.

The questions raised on this appeal require a construction of the contract of June 18, 1935 referred to below, and a determination of whether that contract is still in existence; and the parties before us who are directly interested in these questions are the appellant W. I. Davis and one of the appellees, W. C. Garrett. Mr. Davis was the plaintiff, and Mr. Garrett, one of the defendants.

Plaintiff W. I. Davis brought this action against a Texas corporation styled Haslam Lumber Company, Inc., a partnership styled Haslam Lumber Company, allegedly composed of C. A. Vanderberg, Catherine Gillespie, a feme sole, and the aforesaid W. C. Garrett, and against C. A. Vanderberg, Catherine Gillespie and W. C. Garrett, individually and as members of said partnership. Plaintiff alleged that on or about March 3, 1943 the defendants had wrongfully entered upon a 480 tract of land in the John Hughes Survey in Shelby County and had cut and removed from this tract, and had converted to their own use 62,361 feet of pine timber, log scale, which they had manufactured into lumber; that land and timber belonged to plaintiff; that

plaintiff yet owns said land and that defendants were threatening re-entry thereupon. He prayed that defendants be restrained from re-entering upon said tract, that he recover the value of the lumber, or in the alternative, of the timber, and for general relief.

Defendants filed a joint answer in which they pleaded the contract of June 18, 1935, as authority for the conduct charged against them by the plaintiff. They alleged that this contract was in force and that they had the right, by virtue of this contract, to enter upon the land and to cut and remove therefrom pine timber of the dimensions specified in the contract. They also filed a cross action in which they alleged that this contract covered many tracts of land in addition to that described in the petition; that plaintiff had removed a great quantity of timber from various tracts covered by this contract, including that referred to in the petition, and they prayed that this contract be declared to be in full force and effect and their rights thereunder established and quieted, that they recover the value of the products made from the timber plaintiff had removed, or, in the alternative, the value of the timber, and for general relief, etc.

Both plaintiff and defendants filed supplemental pleadings but these need not be described.

The cause was tried to a jury and pursuant to their verdict, which is referred to below in more detail, the trial court rendered judgment: (1) decreeing defendant W. C. Garrett to be the sole owner of the purchaser's rights under the contract of June 18, 1935; (2) adjudging that this contract remained in full force and effect and bound the plaintiff, and covered the timber therein described, situated upon the various lands described in said contract; (3) that plaintiff recover the title to and possession of the land described in the petition, subject, however, to defendant Garrett's rights under the contract; (4) that the description in the contract of the timber sold thereunder was to be applied as of the date the timber was felled and not as of the date of the contract; (5) that plaintiff recover of defendant

W. C. Garrett and Haslam Lumber Co., Inc. the sum of $587.81, the contract price of a part, and the reasonable value of the remainder, of the $62,361 feet of timber cut by the said defendants during 1943 from the land described in plaintiff's petition (the corporation was still in existence, defendant Garrett being president thereof, when this timber was cut, and the timber was actually cut by the corporation's agents); and (6) that defendant W. C. Garrett recover all costs. Defendants Vanderberg and Gillespie were dismissed. From this judgment plaintiff has appealed.

The contract of June 18, 1935 was an executory contract for the sale of pine timber, made between R. C. Adams as seller and defendants C. A. Vanderberg and W. C. Garrett as purchasers, and was drawn by plaintiff, (a lawyer) pursuant to instructions given him by the parties. The timber sold was situated upon numerous tracts of land in Shelby County (21 are listed in the contract, out of a lesser number of surveys) forming several disconnected blocks, rather widely disbursed about the county, amounting in all to 4,608.8 acres of land. The quantity of timber which was sold under this contract was not estimated or measured before the contract was made and the parties did not know how much timber was being sold. Mr. Garrett said that he "went over a good deal of the timber" before buying it, but he evidently took only a rough and general view for the purpose of forming some opinion of the character and quantity of timber which was being purchased. Nor was any advance payment made by the purchasers. They did deposit $250 with Mr. Adams, but under paragraph 18 of the contract this deposit constituted security for the bi-monthly payments which under paragraph 9 of the contract the purchasers were to make for the timber as they felled it, and Mr. Garrett testified that he intended to deduct this sum from the last payments which he might make under the contract.

The relevant parts of the contract are as follows:

"This Agreement made and entered into this the 18th day of June, A.D. 1935, between R. C. Adams of Center, Texas, Owner, and W. C. Garrett and C. A. Vanderberg of Haslam, Texas, Purchasers, Witnesseth:

"1. The owner agrees to sell and the purchasers agree to purchase and pay for all the sound merchantable pine timber of the circumference of 36 inches and greater, 12 inches from the ground, now standing, growing and/or situated on the tracts of land described below, from which sound saw-logs 10 feet in length of the diameter at the top end of 8 inches under both barks, can be obtained, said land being described as follows: (Description omitted).

"2. Purchasers shall at once begin cutting and removing all such timber from the tracts of land above described in the order directed by the seller, his legal representatives, and/or assigns, and continue such removal in such order, and so conduct their logging operations as to remove all timber cut from the woods to the sawmill of purchasers, and have the same scaled before said logs become damaged.

"3. In cutting and felling said timber, purchasers agree to cut or cause the same to be cut at a height of not more than 12 inches from the ground, and in such manner as to prevent each tree being severed from the stump from splitting or splintering. * * *

"Lands Intended For Immediate Cultivation

"6. It is the desire of the seller to have some of the above tracts and/or portions of tracts cleared up for the purpose of having the same put into cultivation by himself and/or his assigns and as to such lands which the seller or his assigns may conclude to place in a state of cultivation, it is hereby expressly stipulated, contracted and agreed:

"(a) That such tracts and/or parts of tracts shall be designated by the seller and/or his assigns, either upon the ground or by field notes, describing such areas with sufficient accuracy as to identify the same;

"(b) That such designations shall be made upon the ground, or by field notes thereof, furnished to the purchasers before the timber is removed therefrom;

"(c) Upon having such tracts or parts of tracts designated upon the ground, or field notes thereof furnished as provided in the preceding paragraph, purchasers agree, bind and obligate themselves to cut (in addition to the merchantable pine timber 36 inches in circumference, 12 inches from the ground as provided for in paragraphs 1, 2, 3, 4 and 5 above) and pay for all the merchantable pine timber (beneath the circumference of 36 inches, 12 inches from the ground) from which a 2 x 4 14 feet in length, can be obtained, when properly manufactured.

"7. In felling such timber of the circumference of less than 36 inches, from the tracts and/or parts of tracts designated for future cultivation, such timber shall be cut, leaving what is commonly called a "square stump"; that is, each such tree shall be cut at a height from the ground not greater than the diameter of such tree, and after it is cut down, it shall be determined whether or not such tree contains as much as 26 lineal feet of merchantable timber, capable of producing when cut into proper lengths, and properly manufactured, timber of the dimension of 2 x 4, and if so, then such tree shall be cut into two saw logs of such lengths as the purchasers may choose; purchasers shall be required to cut only one log from such trees as do not contain as much as 26 lineal feet of merchantable timber. * * *

"9. The purchasers agree to pay to the seller, his legal representatives or assigns, semi-monthly, at Center, Texas, on the first and 16th days of each calendar month for all timber cut at the rate of $5.00 per thousand feet; that cut and scaled on and before the 15th day of any calendar month to be paid for on the 15th day of such month, and that cut on and after the 16th day of any calendar month, shall be paid for on the first day of the following calendar month.

"10. All merchantable pine timber of the kind specified above that is cut down and left in the woods, whether in the form of saw logs in the tops of trees from which one or more logs have been cut, or in any other form, the same shall be paid for at the rate of $5.00 per thousand feet.

"11. When a tract of land has been designated by the seller, his legal representatives or assigns, for cutting, the purchasers agree to confine their operations to such tract until all of the merchantable pine timber of the kind and sizes hereinabove provided, situated on such tract, has been cut and removed.

"12. When the cutting and removal of the timber from any particular tract shall, in the judgment of the purchasers, have been finished, they shall notify the seller, his legal representatives or assigns, and if requested so to do by the owner, shall go over such tract, inspect the remaining timber thereon, and obtain a release from such owner of any obligation to further cut and/or remove timber therefrom, before beginning operations on another tract.

"14. Said timber contained on the tracts of land hereinabove described shall be removed at the rate of not less than One Hundred Thousand feet per month, except during the months of December, January, February and March. As to said months, the removal rate shall be the same, unless road conditions are such as to make it impossible or impractical to maintain such rate. In any event, said removal rate shall be maintained as nearly up to 100,000 feet per month as road and weather conditions will admit. During said months of December, January, February and March, the purchasers shall be consulted with reference to the tract and/or tracts most accessible to haul during said months, and their choice of tracts shall be controlling during such months, but the seller, his legal representatives and/or assigns, shall have the right to designate the order of removal during the remaining months. * * *

"16. If, in the judgment of the seller, his legal representatives and assigns, the purchasers, their agents or representatives are not complying with the provisions of this agreement, they shall be privileged to call to the attention of such purchasers their agents and/or representatives, to the particulars in which this agreement is not being complied with.

"17. Failure on the part of the purchasers to comply with any of the provi-

sions hereof, shall, at the option of the seller, his legal representatives or assigns, terminate the purchasers' right to cut timber from any additional tract or tracts, but such termination shall not relieve the purchasers of their obligation to complete the cutting and removal of the timber from any tract theretofore partially cut over.

"18. Purchasers shall make an advanced payment of $250.00 by June 1, 1936 to serve as a guaranty of the semi-monthly payments; said sum to be held by the seller, his legal representatives and/or assigns, during the life of this agreement, and at the termination thereof, the amount due by the purchasers to the seller, his legal representatives or assigns, shall be deducted therefrom, and the remainder thereof shall be paid to said purchasers."

The lands and timber described in this contract constituted a part of certain lands which were acquired by the seller, R. C. Adams, on May 31, 1935, 18 days before the contract was made, under a deed to him from T. M. Barham, Trustee of the Property and Assets of Pickering Lumber Company, made pursuant to the orders of the U. S. District Court for the Western District of Missouri. This deed conveyed many tracts of land to Mr. Adams, totaling 7,184.5 acres, which included the 4,608.8 acres described in the contract. On August 10, 1935, Mr. Adams conveyed to plaintiff W. I. Davis, by a special warranty deed, 3,855.9 acres of the land which had been conveyed to him by the Trustee and of this acreage so conveyed, 2,891.5 acres was covered by the contract. It appears that Mr. Adams, although he retained less than one-half of the contract lands, did retain more than one-half of the timber sold under the contract. Plaintiff said that the land conveyed to him had been cut over about 1925, but that the land retained by Mr. Adams had been cut over in 1912 and 1913. Whatever rights the plaintiff W. I. Davis may have had under the contract were acquired under and by virtue of his deed of August 10, 1935 from Mr. Adams. No other transfer was made to him.

It appears that the purchasers of the timber learned of the conveyance to plaintiff. Defendant W. C. Garrett was unable to say exactly when he acquired this knowledge, but he testified once that he heard of it "shortly" after the deed was made to plaintiff, learning not only that Mr. Adams had conveyed some of his lands to the plaintiff but acquiring also a reasonably definite understanding of what these lands were. Mr. Garrett at least knew these facts prior to October, 1937, for during that month he began to cut certain contract timber for the plaintiff on the Tucker and Neal Surveys.

Plaintiff, of course, knew of the contract when he took his conveyance from Mr. Adams.

At the time the contract of June 18, 1935 was made, defendants Garrett and Vanderberg operated a sawmill at Haslam in Shelby County, and it is apparent that they made the contract to procure a supply of timber for their mill. They continued in partnership under the name of Haslam Lumber Company until in 1936 or perhaps in 1938, and then they formed a Texas corporation styled Haslam Lumber Company, Inc. to which they transferred their partnership assets in return for stock in the corporation. Defendant W. C. Garrett was the president of this corporation throughout its existence. He eventually became the owner of all of the stock of this corporation. On or about December 31, 1943, some nine months after this suit was filed, the corporation was dissolved, and defendant W. C. Garrett, owning all of the corporate stock, became the owner of the corporation's assets and remained so at the time this cause was tried. He had continued to purchase and fell timber, and to manufacture lumber therefrom at his Haslam mill, under the assumed name "Haslam Lumber Company".

Hereafter, for convenience, we shall disregard these various changes in the title to the purchasers' contract rights and, as if defendant Garrett had been and had remained the sole purchaser under the contract, shall refer to the conduct of partnership and corporation as if it were the conduct of the said defendant.

Immediately after the contract was made defendant W. C. Garrett began to cut tim-

ber which the seller R. C. Adams requested him to fell, some of it being contract timber and some of it not, and thereafter continued from time to time to fell and remove timber from the contract lands retained by R. C. Adams until during August, 1942, he felled and removed the last of the contract timber remaining upon these lands. The jury found under Issue No. 1 that this timber amounted to 3,700,000 feet, log scale, Defendant W. C. Garrett also cut some timber for plaintiff W. I. Davis during this period, some from contract and some from non-contract lands. The jury found under Issue No. 2 that he had cut 480,000 feet of timber, log scale, from plaintiff's contract lands. This figure seems excessive, but plaintiff has not attacked the finding. Between August, 1942 and March 3, 1943, when he entered the Hughes survey, defendant W. C. Garrett cut no contract timber. He requested plaintiff·in February, 1943, to designate contract timber for cutting but plaintiff declined to do so and advised him that the contract was no longer in force. Defendant Garrett then designated for cutting the tract on the Hughes survey, described in the petition, acting under paragraph 14 of the contract which vested this privilege in the purchasers during December, January, February and March of this year; and on or about March 3, 1943 Mr. Garrett's employees entered the Hughes survey and began to fell timber. Plaintiff filed this suit on March 23, 1943.

Plaintiff asserted on trial that the purchasers' contract rights had expired before defendant Garrett entered the Hughes survey, and he also contended that the contract had been forfeited, either in 1938 or during defendant's operations upon the Hughes survey, or that he was entitled to have a forfeiture declared if the contract had not expired or been terminated by forfeiture. To these contentions defendant Garrett made various defenses which will be discussed hereinafter.

We may now proceed to consider the questions raised on this appeal.

(1) Shall the timber sold under the contract of June 18, 1935 be identified by applying the contract measurements as of the date of the contract, or as of the date the timber is to be felled?

Before felling any tree, defendant Garrett must first determine whether this tree had been sold under the contract, and this must be done by applying the contract description of the sold timber. Plaintiff says that the contract description should be applied as of the date of the contract, June 18, 1935, while defendant Garrett says that the controlling date is the date the tree is to be felled. Defendant Garrett says further that he had consistently followed this practice in felling timber upon the contract lands of R. C. Adams and of plaintiff as well. The jury's findings under Issues 8 and 10 show that of approximately 650 trees cut by defendant Garrett on the Hughes Survey in 1943, not a one met the general description in paragraph 1 as of the date of the contract, although doubtless the description in paragraphs 6 and 7 (which defendant Garrett claims to have followed) was complied with. Under Issue 10 the jury found that of these 650 trees, 400 were below the paragraph 1 measurements on the date of the contract, and under Issue 8 they found that the remainder were too small even when measured by the paragraph 1 description as of the date of felling. The trial court adopted defendant Garrett's construction of the contract.

■ We agree with plaintiff as regards all lands except those which were to be cleared for cultivation under paragraphs 6 and 7 of the contract. Timber upon lands not to be cleared was to be identified by the general description in paragraph 1 of the contract, and this description was to be applied as of the date of the contract. As regards lands to be cleared, paragraphs 6 and 7 apply instead of the description contained in paragraph 1; and the description in paragraphs 6 and 7 was to be applied as of the date timber was to be felled. Paragraphs 6 and 7 do not affect the merits of this appeal, since it does not appear that much of the contract lands were to be cleared. It seems clear that the object of the contract was the purchase and sale of sawmill timber, of the description in para-

graph 1, and that the parties expected the description in paragraph 1 to be applied in all but a few cases. Our reasons for the conclusions follow:

The provision in paragraph 1 which described the timber sold by R. C. Adams and purchased by defendants Garrett and Vanderberg reads (We have interpolated the numerals): "The owner agrees to sell, and the purchasers agree to purchase and pay for all (1) the sound merchantable pine timber (2) of the circumference of 36 inches and greater 12 inches from the ground, (3) now (4) standing, growing and/or situated on the tracts—described below, (5) from which sound saw logs 10 feet in length of the diameter at the top end of 8 inches under both barks, can be obtained."

All of this description might be given effect. The description contains five elements, which we have indicated by numerals, and each of these five elements must be applied to any tree on contract lands before the purchaser can determine whether that tree was sold under the contract or not. The 3rd of these five elements, the word "now", can no more be disregarded than can the 1st, "sound merchantable pine timber", or the 2nd, "of the circumference of 36 inches and greater, 12 inches from the ground"; and the only effect which can be given this word "now" is that of fixing the moment in time as of which the other four elements of the description shall be applied. This moment must be the date of the contract.

In view of the decision in Houston Oil Co. v. Boykin, 109 Tex. 276, 206 S.W. 815, there is no reason for making a distinction here between the executory contract before us and a timber deed conveying the right to remove timber, either for a definite time or for a reasonable time. The following authorities are therefore persuasive in construing paragraph 1; Miller & Vidor Lumber Co. v. Kirby Lumber Co., 112 Tex. 277, 246 S.W. 354; Zimmerman Mfg. Co. v. Wilson, 201 Ala. 70, 77 So. 364; Griffin v. Anderson-Tully Co., 91 Ark. 292, 121 S.W. 297, 134 Am.St.Rep. 73; Crawford v. Atlantic Coast Lumber Co., 79 S.C. 166, 60 S.E. 445; Evans v. Dobbs, Ky., 112 S.W. 667; Vandiver v. Byrd-Matthews Lbr. Co., 146 Ga. 113, 90 S.E. 960; Crain v. Hoefling, 56 Cal.App.2d 396, 132 P.2d 882; Brown v. Thompson, 183 Ga. 495, 188 S.E. 821.

Defendant Garrett says that the contract description of timber sold, quoted from paragraph 1 of the contract, must be construed with paragraphs 6(c), 7 and 11 of the contract, and that these four paragraphs when read together show that the parties intended to identify the timber sold by applying the contract measurements as of the date the timber is to be felled. The question, of course, is what did the parties intend, but we disagree with the construction suggested by defendants. The contract description of timber sold which appears in paragraph 1 is general in terms and must have been intended to apply to all contract lands which the seller did not intend to clear for cultivation. Paragraphs 6(c) and 7, on the other hand, constitute a section of the contract entitled "Lands intended for immediate cultivation" and provide a method whereby the seller might clear his land for cultivation as well as sell the timber on those lands. Paragraphs 6(c) and 7 thus apply only to such lands as the seller desires to clear and cultivate, that is, to such lands as are referred to by the quoted title; and only as regards such lands will these paragraphs extend the general description of sold timber, made in paragraph 1. The description of timber to be cut under paragraphs 6 and 7 of the contract will necessarily be applied as of the date the timber is to be felled. Paragraph 11 refers both to the general description in paragraph 1 and to that in paragraphs 6 and 7, and states a rule which is to be applied to both cases. It evinces no intention to modify either description.

Defendant Garrett also refers to the fact that under his construction plaintiff will receive payment for such part of the timber as may be represented by growth since June 18, 1935. The argument disregards the fact that the timber sold under the contract has more than doubled in value since the contract was made. The contract sales price was $5.00 a thousand feet; and under Issue 15 the jury found that the value of the timber cut on the Hughes survey dur-

ing March and April, 1943 was $12.50 a thousand feet.

Defendant Garrett also refers to his consistent practice, before this suit was filed, of ascertaining what timber was sold under the contract by applying the contract description in paragraph 1 as of the date the timber was felled by him. Such an argument is only persuasive when the contract is ambiguous and the present contract is not ambiguous in the respect now under consideration. Further, it cannot be said as a matter of law that either R. C. Adams or the plaintiff knew of defendant's practice and no issue was put to the jury regarding the matter.

Counsel for defendant W. C. Garrett adverted to another matter on trial which has been given some weight in at least one decision, Bryant v. Bates, Ky., 39 S.W. 428, namely, the difficulty at present, many years since the contract was made, of identifying the timber which on June 18, 1935, did meet the description in paragraph 1. This difficulty, of course, could have been altogether avoided by branding the trees sold, as seems sometimes to be the practice elsewhere. See: North Georgia Co. v. Bebee, 128 Ga. 563, 57 S.E. 873; Day v. Asher, 141 Ky. 468, 132 S.W. 1035; Lang v. Bach, 142 Ky. 224, 134 S.W. 188; Bowerman & Co. v. Taylor, 127 Ky. 812, 106 S.W. 846. This difficulty could be largely avoided even now by keeping in mind the average yearly increase in the diameter of the pine trees on the contract lands, which under Special Issue 4 the jury found to be ½ inch yearly. However, decisions cited above show that the courts have generally refused to give any effect to this difficulty, in view of the unambiguous contract made by the parties.

(2) During what period of time was the contract to endure? Might the rights of the purchasers under the contract expire by lapse of time? Had these rights expired before Defendant Garrett entered the Hughes Survey in March, 1943?

The contract specifies no term during which it shall exist and at the end of which the purchasers' rights shall terminate. However, the contract clearly shows that the parties intended only to vest the purchasers with the right to fell and remove and thereby to acquire title to the felled timber. Further, in paragraph 14 the purchasers bound themselves to fell timber at the minimum rate of 100,000 feet per month during at least 8 months of the year. If the contract rights of the purchasers may expire by lapse of time, before complete performance by the purchasers and without a declaration of forfeiture by the seller, under paragraph 17, the period of time these rights will exist must be implied from either one of these two matters. What did the parties intend? Plaintiff says that the 100,000 feet monthly provision in paragraph 14 shows that the parties intended to fix an ultimate time limit beyond which the purchasers' rights should not endure, to be measured by the time which purchasers would require for cutting the contract timber if they complied with the 100,000 feet provision. For this he cites Coquille Mill & Tug Co. v. Robert Dollar Co., 132 Or. 453, 285 P. 244. In the alternative, he says that the parties at least intended that the purchasers' rights should expire at the end of a reasonable time for the performance of purchasers' contract obligations, and for this he cites Hendrix v. W. R. Altman Lbr. Co., Inc., 5 Cir., 145 F.2d 501.

If the duration of the contract was fixed by the 100,000 feet monthly clause, or if the purchasers' rights endured only for such a time as was reasonably required for performance of purchasers' obligations, the term of the contract came to an end before defendant W. C. Garrett entered the Hughes survey in March, 1943. For the jury found under Issue 5 that a reasonable time for cutting and removing all of the contract timber had expired before March 3, 1943 (when Defendant Garrett entered the Hughes survey); and it appears from the findings under Issues 1, 2 and 3, which state the quantity of timber cut for R. C. Adams and for plaintiff, and also state the quantity of timber on plaintiff's contract lands meeting the contract specifications, that any period of time depending upon an application of the 100,000 feet monthly clause had also expired before March 3, 1943.

We only need, therefore, to determine whether the contract rights of the purchasers might expire by lapse of time, or whether these rights could only be terminated by an act of forfeiture, abandonment, performance or the like.

We hold upon the grounds hereinafter stated that the contract rights of the purchasers would expire by lapse of time. Therefore, under the findings of the jury just referred to, we hold further that the purchasers' contract rights had in fact expired, by lapse of time, before defendant Garrett entered the Hughes survey in March, 1943, prior to the filing of this suit. For if the minimum felling requirements in paragraph 14 ought to be construed as not affecting the duration of the purchasers' contract rights, those rights would then endure only for a reasonable time.

We have alluded to the circumstances attending the making of the contract of June 18, 1935. The parties did not know how much timber was on the lands described in the contract. None of the timber to be sold was paid for in advance; all of it was to be paid for at fixed and regular intervals after it was felled and scaled by the purchasers. From a consideration of these facts and the language of the contract, it is evident that the contract was an executory agreement for the purchase of timber under which no title to the timber nor to any interest in the land vested in the purchasers. See Jones, Administrator, v. Gibbs, 133 Tex. 645, page 649 (headnote 4), 130 S.W.2d 274.

However, this contract did vest the purchasers with the legally enforcible right to enter upon the contract lands and to fell and remove therefrom and to acquire title to the timber sold under the contract; and these rights are the equivalent of, and indeed seem to be identical with, the rights which the purchasers would have acquired if R. C. Adams had executed and delivered to them a timber deed in the ordinary form, conveying to them the right to remove timber within a fixed or a reasonable time. See: Houston Oil Co. v. Boykin, 109 Tex. 276, 206 S.W. 815, affirming Tex.Civ.App., 153 S.W. 1176; Carter v. Clark & Boice Lumber Co., Tex.Civ.App., 149 S.W. 278; Jones v. Gibbs, 133 Tex. 627, 130 S.W.2d 265, 131 S.W.2d 957; Smith v. Jasper County Lbr. Co., 124 Tex. 156, 76 S.W. 2d 505, page 508 (headnote 6, 7); Temple Lbr. Co. v. Arnold, Tex.Civ.App., 14 S.W.2d 926. No title passes under such a deed. Both forms of agreement are, in effect, executory, and since equivalent rights vest under the contract and under such a timber deed we may apply to the contract the rules of construction which have been applied to the deed.

Regarding timber deeds which are construed as vesting the grantee with only the right of removal, as distinguished from an estate in the timber or the right to remove the timber whenever grantee pleases, it is held that if no time limit for removal is fixed in the deed, then only a reasonable time for removal (to be measured by the circumstances of the particular case) is granted, and that when the end of this period arrives the grantee's right to remove automatically expires, without an act, or declaration, of forfeiture by the grantor. Houston Oil Co. v. Boykin, Tex. Civ.App., 153 S.W. 1176, affirmed 109 Tex. 276, 206 S.W. 815; Montgomery County Development Co. v. Miller-Vidor Lumber Co., Tex.Civ.App., 139 S.W. 1015; Beauchamp v. Williams, Tex.Civ.App., 115 S. W. 130; Davis v. Conn, Tex.Civ.App., 161 S.W. 39. The same effect is given the grant of the right to remove timber for a definite time; at the end of the time limited in the deed the purchasers' right expire automatically. Houston Oil Co. v. Boykin, 109 Tex. 276, 206 S.W. 815; Broocks v. Moss, Tex.Com.App., 212 S.W. 153, affirming Tex.Civ.App., 175 S.W. 791; Jones v. Gibbs, 133 Tex. 627, 130 S.W.2d 265, 131 S.W.2d 957; Carter v. Clark & Boice Lbr. Co., Tex.Civ.App., 149 S.W. 278; Lancaster v. Roth, Tex.Civ.App., 155 S.W. 597; North Texas Lumber Co. v. McWhorter, Tex.Civ.App., 156 S.W. 1152; Davis v. Conn, Tex.Civ.App., 161 S.W. 39; Chavers v. Henderson, Tex.Civ.App., 171 S.W. 798; Dunsmore v. Blount-Decker Lumber Co., Tex.Civ.App., 198 S.W. 603; Adams v. Fidelity Lumber Co., Tex.Civ. App., 201 S.W. 1034; Conn v. Houston Oil

Co., Tex.Civ.App., 218 S.W. 137; Temple Lumber Co. v. Arnold Tex.Civ.App., 14 S.W.2d 926.

These holdings are not based upon any covenant by the timber grantee, express or implied. Houston Oil Co. v. Boykin, 109 Tex. 276, 206 S.W. 815.

The following reasons have been expressed for holding that a right to remove timber expires automatically at the end of a reasonable time, if no definite period has been fixed for the exercise of this right. In Beauchamp v. Williams, Tex. Civ.App., 115 S.W. 130, at page 133 the court said: "In other words, that to give effect to the evident intention of the parties to the contract that the time in which the trees should be removed was not to be without limit, the sale should be held to be upon condition, in the absence of a limit fixed, that the purchaser should remove the timber in a reasonable time. As to what was a reasonable time, under all the circumstances of the case, within which appellant should have removed the timber was a question for the determination of the jury." In Lodwick Lumber Co. v. Taylor, Tex.Civ.App., 99 S.W. 192, at page 194,. the court said: "The contract under consideration contains no limitation as to the time within which the grantee is to cut and remove the timber from the land. It cannot be presumed that the parties intended that the timber should remain on the land indefinitely, drawing sustenance from the soil, for such a construction would deprive the owner of the beneficial interest in the land. Nor will it be presumed that it was the intention of the parties to subject the land to a permanent easement, when the effect of such easement would be to deprive the owner of the land of its full use and enjoyment for an indefinite time. In such case the law implies that the contract is to be performed within a reasonable time". On rehearing the court set aside their judgment, under the Supreme Court's construction, at 100 Tex. 270, 98 S.W. 238, 123 Am.St.Rep. 803, of the timber deed before them, but the comments of the Court of Civil Appeals are applicable to an instrument like that construed in Houston Oil Co. v. Boykin, supra.

These reasons are also applicable in determining whether a definite time limit fixed for the removal of timber by a timber grantee shall be literally enforced.

The statements quoted are relevant here despite the fact that this contract differs in some respects from the timber deeds reviewed in the decisions quoted from above. The analogy between the contract of June 18, 1935, and such timber deeds is heightened by our holding that only certain pine trees were sold under the contract, namely, those meeting, on June 18, 1935, the description set out in paragraph 1, subject to the exception provided in paragraphs 6 and 7.

■ Because of the analogy between the contract of June 18, 1935, and the timber deeds which are construed as granting only a right to remove timber, we hold that the contract before us was intended to endure only for a certain period of time (which, as hereinbefore stated, we are not required to ascertain), and that despite the other circumstances and findings by the jury discussed below, the purchasers' rights under the contract automatically expired at the end of that time.

This conclusion is strengthened by the indivisibility of purchasers' obligations under paragraph 14 to cut a minimum quantity of timber during 8 months of each year, and by the consequences of seller's right to convey his lands. It might become a difficult matter to ascertain whether this provision was being complied with and the seller's grantees, for this reason and because the particular obligation is certainly indivisible, might have difficulty in determining whether their lands were bound by the contract or not.

The contract before us differs from timber deeds construed in the decisions cited above in these respects, namely, the fact that the purchase price was not paid in advance, the seller's right of forfeiture expressed in paragraph 17 of the contract, and the purchasers' absolute obligation to cut, remove and pay for the timber sold. However, we have attached no controlling significance to any of these matters. The contract being an enforcible obligation,

binding both seller and purchasers, it vested the purchasers with as absolute and enforcible a right to fell, remove and acquire title to the timber as would a timber deed like that in Houston Oil Co. v. Boykin, supra, for which the full purchase price of the timber had been paid in advance. The right of forfeiture expressed in paragraph 17 was given the seller in order to secure, by threat, the purchasers' performance of the contract; it can only be exercised in case of breach by purchasers and no right of termination has been vested in the purchasers. The purchasers' enforcible obligation to fell, remove and pay for timber evinces no intention to leave indefinite the time for the purchasers' performance, for a part of it is the obligation of cutting at least 100,000 feet of timber per month during 8 months of the year and the obligation, during the remainder of the year of cutting as much timber as the purchasers can. See paragraph 14. If this obligation affects the duration of the contract it makes valid plaintiff's argument that the parties, through paragraph 14, intended to fix an ultimate time limit upon the exercise of the purchasers' rights, and makes applicable here the decision in Coquille Mill & Tug Co. v. Robert Dollar Co., supra.

Our conclusions do not create a forfeiture in plaintiff's behalf. Purchasers' rights are not forfeited under our construction of the contract; having been granted for only a certain period of time they automatically expire at the end of that time.

(3) Does the seller's right during 8 months of the year to designate the tracts upon which timber is to be felled affect the duration of the purchasers' right to fell, remove and acquire title to the contract timber?

The right of designating tracts of timber to be felled during the remaining 4 months of the year was vested in the purchasers. These rights of designation are expressed as follows in paragraph 14 of the contract: "During said months of December, January, February and March, the purchasers shall be consulted with reference to the tract and/or tracts most accessible to haul during said months and their choice of tracts shall be controlling during such months, but the seller, his legal representatives and/or assigns shall have the right to designate the order of removal during the remaining months." And further, it is provided in paragraph 2: "Purchasers shall at once begin cutting and removing all such timber from the tracts of land above described in the order directed by the seller, his legal representative, and/or assigns, and continue such removal in such order, * * *."

With these provisions should also be considered paragraphs 11 and 12 of the contract. Defendant Garrett has referred to paragraph 6; but as we have stated above, paragraph 6 provides for a special and exceptional case, namely, land to be cleared for cultivation, and it has no application to the matter now under consideration. It is a separate part of the contract.

Defendant Garrett argues that seller's exercise of the right of selection and designation expressed in the quotation above from paragraph 14 and 2 constitutes a condition precedent, not only to the necessity of purchasers performing their obligation to fell and remove contract timber, but also to the existence of the purchasers' right to do this in any event, and he argues further that plaintiff's failure to designate tracts of timber for felling did not put an end to the contract but left Defendant Garrett with the option of waiting until this selection was made. This argument directly affects the duration of the purchasers' rights under the contract: Defendant Garrett says it is a consequence of his argument that duration of the purchasers' rights cannot be fixed by the 100,000 feet monthly requirement in paragraph 14, nor can any time limit upon the existence of those rights be implied.

We do not agree with this construction of the contract, and we hold upon the following grounds that the seller's right of selection was but a personal privilege, to be exercised by him, or not, as he saw fit: (a) Defendant Garrett's construction is inconsistent with the object of the contract, which we take to be the sale of the timber and its removal and being paid

for without delay. For under defendant Garrett's construction the seller would have the power to materially delay the accomplishment of this object. No reason appears for purchasers having entered into a contract to purchase timber which they needed for their mill and at the same time, vested seller with the power of preventing, or at least materially hindering, their getting this timber. (b) The seller's power to designate is expressed in paragraph 14 in terms of right, not in terms of duty. Seller nowhere expressly promised purchasers to designate tracts of timber for felling; such a promise must be implied. Why imply a promise which could easily have been made in express terms? (c) The exercise of the seller's power to designate tracts of timber for felling obviously formed no part of the consideration for the purchasers' promises. An exercise of this power was not essential to purchasers' performance; purchasers could just as well fell, remove and pay for the contract timber without seller's designation as with it. An exercise of this power promised no benefit to purchasers; rather, it entailed possible burdens upon them, for they might have preferred to follow a different order of cutting timber, and in paragraph 14 they undertook to protect themselves against seller's use of a power of designation during December, January, February and March of each year. Seller's failure to exercise this power could do purchasers no harm. (d) Our own construction would give effect to the entire contract, seller's rights as well as purchasers' obligations, and would subserve the object of the contract and fully protect the interests of the parties.

Thus seller's right to designate the order in which purchasers shall fell timber during 8 months of the year does not constitute an obligation and is not a covenant running in behalf of purchasers, and his failure to exercise this right is not a breach of contract. This power, instead, could only subserve seller's purposes and must have been given him to that end, and as hereinbefore stated should be construed as a personal privilege which he might or might not exercise, as he saw fit.

This privilege, therefore, because of its very nature, must be exercised by the seller so as not to delay the purchasers' performance and their getting the timber they had bought; otherwise, the right to exercise it is necessarily waived, at least for the time being, and the purchasers became free to fell such of the contract timber as they might elect to fell.

Further, being free, for the time being at least, of the seller's privilege, they were bound to proceed with their own selection of timber for felling, for the waiver of the seller's privilege through the seller's failure to exercise it necessarily left in force purchasers' promise to fell, remove and pay for the timber. Therefore, for at least this reason, the term of the contract would continue to run on toward its expiration date despite seller's failure to exercise his privilege of designating,—subject perhaps to some equitable extension where it might be thought that purchasers had reasonably waited upon the seller, expecting him to make a designation. The following decisions are suggestive: Jordan v. Friedman, 72 Cal.App. 726, 165 P.2d 728; Boston Ins. Co. v. Kirby, Tex.Civ.App., 281 S.W. 275; Frankfort Distilleries v. Burns Bottling Machine Works, 174 Md. 12, 197 A. 599; Alexander v. Good Marble & Tile Co., Tex.Civ.App., 4 S.W.2d 636, 637; A. J. Anderson Elec. Co. v. Cleburne Water, Ice & Lighting Co., Tex.Civ.App., 27 S.W. 504.

It is also a result of our construction that the plaintiff was under no obligation to complain to defendant Garrett of defendant's breach of any contract provision. Defendant Garrett, having obligated himself, was bound to fulfill his obligation without any notice from the plaintiff that he do so. This, of course, might not be true if the right of forfeiture under paragraph 17 of the contract was involved, but under conclusions stated hereinafter the matter of forfeiture is immaterial.

Accordingly, no legal effect, as regards the expiration of purchasers' rights through lapse of time may be given plaintiff's failure to designate timber for felling, or to plaintiff's failure to complain to defendant Garrett of defendant's breach of contract. For plaintiff waived his right to designate timber for felling by his failure

to exercise that right, and Defendant Garrett was not authorized to wait upon the plaintiff as long as he did if he is to claim any right against plaintiff by virtue of this designation privilege. The last contract timber he cut for plaintiff, according to his own theory of the facts and the jury's finding under Issue 45, was cut upon the Forsythe Survey, in October and November, 1940, more than two years before he requested plaintiff, in February, 1943, to designate timber for felling.

(4) We have next to consider several groups of Special Issues which were submitted to the jury. To ascertain the meaning of the findings made under these Issues, we have had to consider the evidence. The following selections from the testimony, almost all of it from the testimony of Defendant Garrett, will be sufficient to show the basis of our construction of the jury's findings, and the basis of our conclusions regarding the effect to be given these findings.

Defendant Garrett made almost no effort to comply with the provision, in paragraph 14, of the contract, requiring him to fell not less than 100,000 feet of logs during the months, April to November, inclusive, of each year. Under Issue 6 the jury found that this provision was breached in 51 of the months in which it was in force, during the period from July 1, 1935 to September 1, 1942. This provision was actually in force during only 61 months of this period, so that it was complied with in only 10 months of this period of over 7 years. The jury seem to have included in these 10 months 2 of the winter months during which the provision was not in force, but the finding has not been attacked. It also seems that during several, 15 or more, of the 51 months referred to under Issue 6, defendant Garrett cut no contract timber at all. Under Issue 7 the jury found that defendants removed none of the contract timber (nor as a matter of fact did they fell any of this timber) from September 1, 1942 until March 3, 1943. The evidence shows, however, that in February, 1943 defendant Garrett requested plaintiff to designate timber for felling.

Defendant Garrett's testimony proves conclusively that his breach of this 100,000 feet monthly requirement was caused by his own acts, that is, his operations involving non-contract timber, in which R. C. Adams (but not the plaintiff) actively participated.

Defendant Garrett said that the contract of June 18, 1935 was one of the first he and defendant Vanderberg made after establishing their mill at Haslam, and he had no recollection of any other contract in force on June 18, 1935 which would have interfered with the performance of the contract made on that date.

He denied that a breach of the 100,000 feet monthly requirement was due to the weather, to shortage of labor or material, to the process of scaling the timber felled under the contract, or to compliance, sometimes required of them, with paragraphs 6 and 7 of the contract, authorizing the seller to clear contract lands for cultivation and broadening somewhat the description of timber to be felled by purchasers.

Defendant Garrett positively affirmed on several occasions that he had always had potential capacity to comply with the 100,000 feet monthly requirement. He testified:

(1) "Q. And subsequent events proved —subsequent conditions were such that you could have cut that 100,000 feet every month, couldn't you? A. I think so, yes, sir.

"Q. Could have done that rather easily, could you? A. I think I could, yes.

(2) "Q. Had you concentrated on cutting under the contract you could have cut all of the timber covered by the contract in the space of three or four years, couldn't you? A. Yes; if we had just put all of our equipment, taken all their logs, we could have done that, yes.

(3) "Q. Now, in addition to that (contract timber cut prior to September 1, 1942) you cut many additional millions during the same period of time, didn't you? A. Yes, Oh, yes.

"Q. You were cutting much more than 100,000 feet per month, considering all of your cutting? A. Yes, sir.

"Q. Would you say it would run 500,-000 feet a month or ———? A. In addition to this?

"Q. Yes, sir. A. No, it wouldn't run that much, I don't think.

"Q. About what was your average cut per month? A. That varied, you know, during that time. We first started up with a little bit of a circular mill; then we changed; didn't cut very much. That would have almost supplied us for a while. Then we put in another band mill; burned that out; then put in a heavier band mill; then put in a band resaw. So I would have to do a great deal of figuring to tell you about what it would be.

"Q. If you had seen fit to do so and had concentrated on cutting the timber on the contract you could have cut 200,000, 300,000 feet a month very easily? A. If we had turned all our attention, all our equipment to that one contract we could have done it.

"Q. Could you have done it without strain? A. Yes, if we had put ourselves out. It wasn't no occasion on Mr. Adams account".

Defendant Garrett's testimony shows that after July 18, 1935, his timber operations were of some magnitude. Testimony just quoted refers to increases in the capacity of his mill. He bought from R. C. Adams, and felled, almost as much non-contract timber as he felled upon Mr. Adams' contract lands. Under Issue 1 the jury found that he cut 3,700,000 feet of pine timber, log scale, off Adams' contract lands, and under Issue 2, that he cut 480,000 feet of such timber, log scale, off plaintiff's contract lands. Defendant Garrett testified:

"Q. How much timber did you cut for Mr. Adams on lands not covered by the contract during the period from June, 1935 to March, 1943? A. Well, we cut about 3,209,000 feet."

He had testified earlier:

"Q. Do you have a record by which you could give the jury a reasonably fair estimate of the timber you cut from Mr. Adams' lands that were purchased by you outside of this contract during the period of time you were cutting under this contract? (Which we take to be the period ending August 31, 1942). A. Well, I have—taking our estimates on the various tracts that we bought from Mr. Adams during that time we cut about 2,725,000 feet".

He said that he cut about 534,000 feet of timber off plaintiff's non-contract lands while he was cutting contract timber for Adams. Further, it appears that during this period he bought from third persons, and felled, great quantities of timber in Shelby and Panola Counties, much of it on relatively short time limits for felling. He testified:

"Q. And for other people besides Mr. Adams you cut perhaps that much or more, or three times that much? (Counsel is referring to the figures 3,205,000 feet, non-contract timber cut by defendant Garrett for Mr. Adams) A. During that period of years?

"Q. Yes, sir. A. We cut a lot more than that. We cut a good deal of timber over there. This contract wouldn't run us all that period of time."

Mr. Garrett was taking advantage of a timber market on which he could purchase timber at prices substantially lower than the price stipulated in the contract of June 18, 1935. He testified:

(1) "Q. Lots of this timber you were buying for less than the $5.00 a thousand that you were paying Mr. Adams and Mr. Davis, weren't you? A. Yes, sir. Up until a few years ago we could buy plenty of it cheaper than that. I don't imagine we ever made a dime on the Adams contract, except on this stuff we bought in addition there; and we did get some good deals there.

"Q. And you were taking advantage of all those? A. Certainly. We were working for ourselves, you know.

"Q. Sure".

(2) "Q. Has timber advanced or gone down since you made this contract with Mr. Adams? A. It has advanced.

"Q. Does the contract provide that you shall pay $5.00 per thousand feet log scale? A. Yes, sir.

"Q. Was that what you paid Mr. Adams for his timber as you cut it? A. Yes, sir, $5.00 a thousand.

"Q. Did he ever express any dissatisfaction about the way you handled the deal so far as he was concerned? A. None whatever.

"Q. At the time you purchased this timber and obligated yourself to pay $5.00 per thousand what would you say with respect to whether or not in 1935 that was a fair price for the timber? A. That was a high price for timber at that time.

"Q. Were you buying other timber for less than that? A. Yes, sir.

"Q. How much were you paying for timber on an average at that time? A. Oh, $3.00 to $4.00; sometimes $5.00."

He testified several times that it was with R. C. Adams consent, (rather, pursuant to Mr. Adams' desire) that he failed to comply with the 100,000 feet monthly requirement and instead felled non-contract timber. He testified:

(1) "Q. It is complained of here by Mr. Davis that you breached the contract because you didn't cut 100,000 feet a month on Mr. Adams' land. Did Mr. Adams complain at any time about your failure to cut 100,000 feet per month? A. Never did complain about it. He always said it was all right to cut these other tracts; we had short time on them.

"Q. Why didn't you cut 100,000 feet per month on Mr. Adams' tracts involved in this contract? A. That was by cutting some of these other tracts of his. That was the main reason.

"Q. Who asked you to cut the other tracts? A. Mr. Adams.

"Q. Why did he want the other tracts cut? A. Well, he said it didn't make any particular difference about this contract stuff; said it was still growing and he didn't need the money and just let it stand and cut these short time tracts.

"Q. What, if anything, did he say with regard to you complying with the requirement to cut 100,000 feet per month on these tracts? A. He has never mentioned that but one time. He asked us to speed it up for a while, which we did".

(2) "Q. Why did Mr. Adams prefer that he fell these non-contract tracts of timber?

A. Well, these tracts usually didn't have very much time for cutting. And he wanted to get that out. And the other, there wasn't no time limit on it and he said for that to be left. * * *

"Q. Had Mr. Adams insisted that you cut on the tracts included in this contract, at the rate of 100,000 feet per month, until you removed that timber, what would you have done? A. We would have cut it".

(3) "Q. He (that is, Adams) never did tell you—he never did write you and tell you not to cut as much as 100,000 feet, did he? A. He always told me—he told me time and time again that it was satisfactory to go and cut these other tracts that we were buying from him."

(4) "A. Well, Mr. Adams was constantly buying and selling timber and we bought a great deal from him; and instead of cutting on the written contract we would just go and cut out this other stuff.

"Q. All right. Did you cut on the other timbers at your own volition or at the request of Mr. Adams? A. Well, it was usually understood with Mr. Adams; that he would just as soon we go cut these other tracts out and let the contract stuff stand.

"Q. When you would do that at his request did he make any objection to you with respect to your abandoning of the timber cutting agreement here while you were cutting his other timber? A. No. He always told us it was all right to let this contract stand; that the timber was growing and just cut the other out."

(5) "Q. Did you ever have a letter from Mr. Adams or Mr. Davis either telling you not to cut 100,000 feet a month under the contract? A. Well, I never had any letter. But I talked to Mr. Adams repeatedly about it, about cutting under the contract, and he always said it was all right to cut on those other tracts and we would move over on those other tracts for long period—for sometime.

"Q. Mr. Davis never did tell you it was all right with him to do that? A. No, he never said anything about it.

"Q. And Mr. Adams never did write you any letter stating that it was all right with him for you not to cut as much as 100,000

feet, did he? A. No, I don't think he ever wrote a letter. But he has told me that repeatedly, to cut on other tracts when I wanted to. He never said not to cut 100,000 feet on that; but he has always said—he told us repeatedly it was all right to cut on those other tracts and leave this contract timber."

Defendant Garrett's testimony proves that plaintiff Davis never did anything whatsoever which prevented or could have prevented defendant Garrett's compliance with the contract. This testimony proves further that in dealing with plaintiff, defendant Garrett was governed by his construction of the contract, not by plaintiff's conduct, and that it is as a consequence of his construction of the contract that he charges his failure to comply with the contract (as regards plaintiff) to plaintiff's failure to designate tracts of timber for felling. Witness the following testimony by defendant Garrett:

He said that he cut every tract of timber which the plaintiff designated for felling. (Defendant Garrett felled only two tracts of contract timber for the plaintiff, namely, certain parts of the Tucker and Neal Surveys during October and November, 1937, totaling about 75,000 feet, and, according to the jury's finding under Issue 45, a tract of timber upon the Forsythe Survey, in 1940, totaling either about 240,000 feet according to defendant Garrett or about 147,000 feet according to the plaintiff. Defendant Garrett also cut a large quantity of non-contract timber for the plaintiff, but the last of this timber was apparently felled in 1941).

Defendant Garrett consistently claimed to have had the potential capacity of complying with the contract, that he always could have diverted this capacity to plaintiff's contract lands, and that he was always willing to do this, provided plaintiff wanted it done. Some relevant testimony of defendant Garrett has already been quoted. Defendant Garrett also testified:

(1) "Q. Now, Mr. Garrett, you recognize, do you not, that the speed with which you cut Mr. Adams' timber had a direct bearing on the time within which you could remove Mr. W. I. Davis'? A. No, sir. We was ready to cut Mr. Davis' any time he designated."

(2) "Q. And I believe you stated the other day that if Mr. Davis had asked you to cut his timber you would have cut it? A. Certainly would.

"Q. Now, am I to understand from that that you could have cut his timber at the same time you were cutting Mr. Adams'? A. We wouldn't had had to cut but 50,000 feet for each one. Certainly we could.

"Q. You could have done that easily, could you? A. Yes, sir, easily.

"Q. Had you been disposed to do so you could have cut 200,000 feet a month off of the Adams and Davis land, couldn't you? A. Well, if we had just turned all of our equipment onto that we might have.

"Q. You think you could have done that don't you? A. Well, we might have.

"Q. You could have cut 100,000 feet a month off Mr. Davis' land and still have maintained the rate of cutting that you did maintain on Mr. Adams' land couldn't you? A. Yes, if he had asked us to cut it; if he had given us surveys to cut it, we could have.

"Q. You think you would have done that, do you? A. We would have done it, yes.

"Q. You think you would have cut as much as 100,000 feet on each and every month? A. I don't know that we would have cut as much as 100,000 feet on his, then cut Mr. Adams too. But we would have complied with the contract.

"Q. You could have done that, though, could you? A. What you mean?

"Q. You could have cut 100,000 feet for Mr. Davis and still cut what you did for Mr. Adams? A. I presume, if it had been necessary, we would have"..

(3) "Q. You say that it took—the longer you cut for Mr. Adams, it took you longer to—A. We was ready to cut Mr. Davis' any time he wanted us to".

He said that he did not consult plaintiff as to whether he should comply with the 100,000 feet monthly requirement, although he did consult with R. C. Adams, with the result hereinbefore stated. He testified:

(1) "Q. You never did tell him (that is, the plaintiff) during the months that you were not cutting 100,000 feet, or the months

you were not cutting any—you didn't tell him about those months, did you? A. No, I didn't tell him anything.

"Q. And you didn't consult him—before you fell under the 100,000 feet mark you didn't consult Mr. Davis about that and ask him if it would be all right, did you? A. No. We talked to Mr. Adams about it all the time.

"Q. You never did take Mr. Davis into consideration at the time you were trading and dealing with Mr. Adams on these other tracts? A. No. We expected, when we cut on his timber, to consult with him about his timber. We didn't think it was necessary to consult with him about Mr. Adams'.

"Q. Now, you know that you had bound yourself by written contract to cut at least the 100,000 feet a month, didn't you? A. That's right.

"Q. The contract contemplated at least by its wording that there might be a sale of some of this land by Mr. Adams and the contract used the words 'his assigns' all the way through it, didn't it? A. Yes, that's right.

"Q. And he did sell a very large portion of it, didn't he? A. Yes, sir.

"Q. Of which you knew. But—now, when you got ready to move over and cut other timber for Mr. Adams did you ever go to Mr. Davis and say, 'Now, I'm going to fall under my contract here this month. Will it be agreeable with you?' Did you ever go and ask him such a question as that? * * *

"Q. You never did go to him and ask him if it would be all right for you to cut on other lands belonging to Mr. Adams and cut at a less rate than 100,000 feet per month on the contract land, did you? A. No. We was always ready to cut Mr. Davis' any time he asked us to.

"Q. You never did move your rigs down there, though, and begin cutting with the view of cutting all of his timber off, did you? A. Mr. Davis'?

"Q. Yes. A. No, we didn't move them down there. He didn't ever designate any other land to be cut.

"Q. Now, you never did get a release of that provision of the contract—that is, re-lease from Mr. Davis of that provision of the contract which required you to cut at least 100,000 feet per month on the Adams' tracts, did you? A. No. Mr. Davis never did notify us he had bought the timber. We just learned about it.

"Q. But you did know it? A. Yes, we learned about it."

(2) "Q. Mr. Davis never was taken into consideration in it, was he, until 1943? A. Not on Mr. Adams' part of it, no."

Defendant Garrett's testimony shows that plaintiff did nothing to mislead, or to interfere with him as regards his compliance with the contract. He testified:

(1) "Q. All right. You say you were obligated to cut 100,000 feet a month. And you had cut, during seven years, you had cut the 100,000 feet only seven months, or nine months? A. That's all right. That was all right with Mr. Adams; he always said it was, and he wasn't objecting at all.

"Q. Mr. Davis never did tell you it was all right with him, though, did he? A. He didn't tell me anything.

"Q. All right. You were not paying Mr. Davis any mind, were you? A. None at all when we were cutting on Mr. Adams'.

(2) "Q. When you wrote Mr. Davis on March 3, 1943 that 'On the contrary, we have complied with every provision thereof and have taken every precaution to discharge our obligation under this contract to the full and complete satisfaction of the seller'. A. Uh-huh.

"Q. Now, you knew at that time that you had not—you hadn't been cutting 100,000 feet a month, didn't you? A. I knew we discharged it to the satisfaction of the seller, which was Mr. Adams.

"Q. But you weren't considering Mr. Davis at all in any of your calculations? A. No. Why should we? We did—everything Mr. Davis wanted us to do we would do it. He didn't ask us to do anything in that contract we didn't do it.

"Q. But you were the one who had agreed to cut the 100,000 feet a month, weren't you? A. Yes. But Mr. Adams kept buying timber and we would go to it, cut this tract and that tract, and it was all right with him. He has told us numbers of

times it was all right to go and cut this other timber and let this contract timber stand.

"Q. But Mr. Davis never told you it was all right with him? A. No. I don't see what that has to do with Mr. Davis' part of it at all".

(3) "Q. Mr. Davis never did tell you it was all right with him to do that? A. No. He never said anything about it."

Testimony quoted shows that plaintiff never expressed consent to Defendant Garrett's failure to comply with the 100,000 feet monthly provision.

Defendant Garrett charged his failure to comply, as regards plaintiff, with the 100,-000 feet monthly clause to plaintiff's failure to designate tracts of timber for felling. Some relevant testimony has been quoted. He also said:

(1) "Q. You never did offer to move in on his (plaintiff's) land and start cutting under the contract in order to move the 100,000 feet? A. We moved when he designated; we moved in and cut it.

"Q. That was when he designated—that is when he had designated specific tracts? A. That's right.

"Q. Small tracts. And requested you to cut the timber off for specific purposes? A. That's right.

"Q. But you never did undertake general operations on his land, did you? A. No. We were waiting on him to designate the surveys he wanted cut.

"Q. And at the same time you were buying lots of other timber which you say was cheaper, you were getting it for less than $5.00? A. Yes, sir, that's right.

"Q. And naturally wanted to buy and get as much of that cheaper timber as you could get didn't you? A. Naturally.

"Q. And you also wanted to get as much additional timber from Mr. Adams as you could get, didn't you? A. Certainly.

"Q. And so long as you were getting along all right with Mr. Adams, well, you were taking on these side tracts, so to speak? A. Uh-huh."

(2) "Q. You say that it took—the longer you cut for Mr. Adams, it took you longer to—A. We was ready to cut Mr. Davis' any time he wanted us to.

"Q. You never made any effort to cut on his land? A. We would cut—told him we was ready to cut any time. He never said go down and cut.

"Q. You never made any effort to? Did you ever make any effort? A. Yes, in '43.

"Q. Go down there and ask him? A. After we saw he wasn't going to designate any surveys we went in there, you see. We would cut any time—

"Q. That was '43? A. That's right.

"Q. That is the first time, though, you had undertaken to cut it wasn't it? A. We was waiting for him to designate the timber he wanted cut."

Plaintiff testified in effect that he discovered in 1937 that defendant Garrett was not complying with the 100,000 feet monthly requirement; that he requested R. C. Adams to notify defendant Garrett that said defendant must comply with this requirement, and that Mr. Adams reported to him that he had complied with this request; that defendant Garrett continued to fell less than 100,000 feet of timber monthly and in 1938 he requested Mr. Adams to forfeit the contract, and that Mr. Adams reported to him that he had done so, carrying forward the contract terms as between himself and defendant Garrett by a separate oral agreement (plaintiff fixes this forfeiture at about April, 1938); that he subsequently assumed that the contract was terminated and acted accordingly, referring throughout his testimony to various conversations between himself and defendant Garrett during which his belief that the contract was at an end was expressed; that in the latter part of 1940, he made a new sale to defendant Garrett of contract timber situated upon the Forsythe Survey (defendant Garrett felled this timber during October and November, 1940); that in 1941 he made a new sale to defendant Garrett, at a considerable increase above the contract price, of contract timber located upon the Lout Survey; that he had cut and sold poles off his contract lands in 1939, 1940 and 1941 (it is not entirely clear to us that these poles came within the contract description in paragraph 1 of timber sold); and that early in 1940 he offered contract timber on the Hughes Survey for sale.

Defendant Garrett denied that Mr. Adams had ever forfeited the contract or had ever made any complaint to him about his compliance with the contract. He said that plaintiff had never made any complaint to him about his compliance with the contract; that plaintiff designated the Forsythe Survey timber for cutting under the contract and that he did fell it under the contract, paying the contract price therefor; that he did not know that the Lout timber came off of the Lout Survey; that he had objected immediately to plaintiff's selling the Hughes timber in 1940; and that he believed the contract to be in force in February, 1943 when he requested plaintiff to designate timber for cutting under the contract.

The jury did not accept completely the theory of either party. They found, for instance, under Issue 35, that when plaintiff had cut and removed certain timber from the Lout Survey, and had sold and delivered this to the defendants at Haslam, the defendants knew that said timber was being taken from the Lout Survey. This represents an adoption of plaintiff's contention, and impliedly convicts defendant Garrett of having purchased in 1941 timber which he had purchased under the contract of June 18, 1935. (This implication seems inconsistent with various other findings, especially those under Issues 13 and 14, that when Defendant Garrett was cutting the timber on the Hughes Survey in 1943, he believed, until the day after this suit was filed, that he had the right to cut this timber, and that he had reasonable grounds for this belief.) On the other hand, they found under Issue 45 that plaintiff in 1940 designated his contract land on the Forsythe Survey as land to be cut under the contract; and under numerous other issues, referred to hereinafter, they made findings which show that they rejected plaintiff's contention of a forfeiture having been made in 1938.

We may now proceed to discuss the findings of the jury. Plaintiff has made many criticisms of the trial court's charge but under our construction of the contract of June 18, 1935, and of the various findings hereinafter referred to, all of the findings to which we shall refer are immaterial and plaintiff's criticisms of the charge need not be discussed.

(5) Issues 17 to 21, inclusive, and Issue 25—under Issues 17, 18, 19 and 25 the jury found: (17) Defendants have been ready, willing and prepared at all times since June 18, 1935 to cut and remove from plaintiff's lands the merchantable pine timber covered by the contract, when and as such tracts would be designated by the plaintiff to be cut; (25) any delay in cutting and removing the timber from Mr. Adams' lands was not caused by defendants' failure to cut 100,000 feet per month from said lands; (18) defendants' failure to cut and remove the timber from plaintiff's lands at 100,000 feet a month was caused by plaintiff's failure to designate the order in which plaintiff desired the different tracts to be cut; (19) defendants' failure to cut and remove the timber from plaintiff's lands at 100,000 feet per month was caused by plaintiff's failure to request defendants to so cut and remove said timber.

To ascertain exactly how plaintiff's failure to designate tracts of timber for felling and how his failure to request defendant Garrett to fell and remove contract timber, caused said defendant to fail to comply with the contract, one must go to the evidence; and the evidence shows that this failure to designate and request affected defendant Garrett's conduct only because of the construction which defendant Garrett had placed upon the contract. These findings express nothing but consequences of defendant Garrett's argument that he was not obliged to fell timber until plaintiff had designated tracts of timber for felling and are immaterial under our construction of the contract. Purchasers remained bound to fell, remove and pay for timber despite seller's failure to designate tracts for felling, and seller was no more bound to activate this obligation by requesting that it be performed than he was bound to do so respecting any other unconditional obligation; and the term of the purchasers' contract rights continued to run on toward expiration. Plaintiff's failure to exercise his privilege of selecting tracts of timber for felling, if any such privilege he ever had, resulted as a matter of law in plaintiff's loss of this privilege, and, as we have stat-

ed above, defendants' waiting for this to be done was unreasonable, considering the period of time he said he waited.

Issues 20 and 21 refer to the contract lands as a whole. Under them the jury found: (20) defendants' failure to cut and remove timber from the contract lands at 100,000 feet per month was caused, either wholly or partially, by plaintiff's failure to request defendants·to do so; and (21) defendants' failure to cut and remove the timber covered by the contract, at 100,000 feet per month, was caused either wholly or partially by the conduct of plaintiff.

These two findings are repetitions of matters expressed in the findings just discussed, and are immaterial for the same reasons as are those findings. The evidence identifies the conduct of plaintiff which is referred to in Issue 21, as being the same conduct as is referred to in the other Issues discussed above; the same result follows if we construe the general finding under Issue 21 with the more specific findings under these other Issues.

(6) The following Special Issues refer only to the conduct of R. C. Adams.

Under Issue 22 the jury found that defendants' failure to cut and remove 100,000 feet of logs a month from the contract lands was caused wholly or partially by Mr. Adams' conduct. What this conduct was must be ascertained from the evidence, and the evidence shows that it was Mr. Adams' consent, or rather, his desire that defendant Garrett cut non-contract timber for him instead of contract timber.

Under other Issues the jury found: (24) Adams condoned "any failure" of defendants to comply with the terms and provisions of the contract at all times from the date of the contract to the· present time; (29) defendants' failure to comply with "any" of the provisions of the contract was condoned ·by Adams; (31) Adams continued to permit defendants to operate under the terms and provisions of the contract after defendants' failure to comply with the provisions of said contract in some (for "any") respect; (32) from June 18, 1935 down to the filing of this suit Adams did at all times recognize and deal with these defendants under the contract; (33) from June 18, 1935 down to the filing of this suit Adams accepted from defendants benefits under the terms and provisions of the contract; (34) from June 18, 1935 until defendants had completed the cutting of Adams' timber, Adams continued to accept benefits from defendants under and by virtue of the contract; (38) Adams received benefits from defendants under and by virtue of the contract down to December, 1942; (42) Adams waived strict compliance with the terms and provisions of the contract while the timber was being cut and removed from his lands.

Under Issue 36 the jury found that Adams and defendants mutually waived the performance of the provision of the contract with respect to the volume of logs to be cut per month, and under Issue 37, that they waived the provisions respecting the height at which the trees should be cut from the ground.

The term "waived" was defined in the trial court's charge as meaning "to relinquish intentionally a known right, benefit or advantage which but for such waiver, the party relinquishing would have enjoyed".

None of these findings are material under our construction of the contract. We must go to the evidence to ascertain what these findings mean, and the evidence shows that all of these findings refer to the same conduct, namely, Mr. Adams' consent, or rather, his desire that defendant Garrett cut his non-contract timber in lieu of his contract timber. It does appear from these findings that the jury rejected plaintiff's contention that Mr. Adams forfeited the contract with defendant Garrett in 1938 at plaintiff's request and made a new contract, in parol, with defendant Garrett at the same time; but our conclusion that the contract rights of the purchasers would expire by lapse of time has made the question of forfeiture unimportant. All except an insignificant part of Mr. Adams' conduct occurred after Mr. Adams' deed to the plaintiff. This deed conveyed land and timber; Mr. Adams retained no interest in either, and after this deed was made he

could not extend the contract, and thereby create an additional burden upon plaintiff's lands, by his unilateral action.

(7) The following Special Issues referred, some to Adams and plaintiff, and some to plaintiff alone.

The jury found: (27) Both R. C. Adams and W. I. Davis condoned defendants' failure to cut and remove 100,000 feet of logs a month from the Adams lands during the months when they did so fail; (28) Davis condoned defendants' failure to cut and remove 100,000 feet of logs per month from Adams' lands during the months they did so fail. The term "condone" was defined in the trial court's charge as meaning "to overlook, excuse, or act so as to imply consent thereto".

Under Issue 39 the jury found that plaintiff received benefits from defendants under and by virtue of the contract after learning that defendants were not cutting 100,000 feet a month for Adams. (What these benefits were can only be determined from the evidence, and we take them to be the cutting in 1940 of plaintiff's contract timber upon the Forsythe Survey. See Issue 45). Under Issue 43, the jury found that plaintiff, after learning of the way and manner defendants were cutting Adams' timber, failed to complain or object thereto, or request defendants to desist from cutting the same in the manner and volume in and at which same was being cut.

Under other Special Issues the jury found: (30) both Adams and plaintiff continued to permit defendants to operate under the contract after the failure of the defendants to comply with the provisions of said contract in some (for "any") respect; (44) plaintiff knowingly permitted defendants to cut the timber from some (for "any") of the lands covered by the contract, under the contract, since May 20, 1938; (46) plaintiff has at some (for "any") time since May 20, 1938 requested defendants to cut from some (for "any") tract of land under the terms of the contract.

None of these findings are material under our construction of the contract. As regards Issues 27 and 28, plaintiff had the same right to sit quietly by and "consent" to defendant Garrett's losing his contract rights through his failure to exercise those rights within the time granted him as has a grantor under a timber deed conveying, for the full value of the timber paid in cash in advance, the right to cut timber, either for a fixed or for a reasonable time. The timber grantor need not activate his grantee; the grantee is charged with notice of the effect of his deed, and must either exercise his rights or see them expire and his grantor acquire again the right to sell timber for which he has been fully paid. See the decisions cited above. Plaintiff's condonation referred to in Issues 27 and 28 is the same conduct as is referred to in other Issues listed and discussed here.

The findings under all of the Issues which we have just summarized show, as do others, that the jury rejected plaintiff's contention that the contract had terminated in 1938 through forfeiture; and these findings, with others, doubtless have some bearing on whether forfeiture ought now to be decreed in plaintiff's favor. However, as we have already stated, this matter of forfeiture need not be considered, in view of our conclusion that purchasers' rights might expire through lapse of time.

(8) The findings under Issues 40, 41, 47, 48, 49, 50, 51 and 52 relate to the events upon the Hughes Survey in 1943 and need not be discussed.

(9) Pursuant to the conclusions stated above, judgment is rendered as follows:

(a) The trial court's judgment that the purchasers' rights under the contract of June 18, 1935, vested in defendant W. C. Garrett, were still in force is set aside, and judgment is here rendered declaring those rights to have expired prior to the filing of this suit, and to be no longer in existence.

(b) The trial court rendered judgment in plaintiff's behalf for the contract price of 48,561 feet of the timber cut by defendant Garrett on the Hughes Survey in 1943, and for the remainder of that timber at the rate of $12.50 per thousand feet, which under Issue 15 the jury found to be the reasonable value of said timber at the time and place of cutting. Since the con-

tract price no longer applied. when the timber was cut, liability for all of this timber must be measured by the finding under Issue 15, and the trial court's judgment in this respect is also reversed. The total footage cut being 62,361 feet, judgment is here rendered in behalf of plaintiff W. I. Davis against defendants Haslam Lumber Company, Inc. and W. C. Garrett for the sum of $779.51. Plaintiff has made no demand for the "manufactured value" of this timber.

 (c) The evidence shows that defendant W. C. Garrett will obey the judgment rendered in this cause and that he has no intention of entering upon plaintiff's lands if it be determined that his rights under the contract of June 18, 1935, had expired. Any injunctive relief is therefore denied plaintiff.

 (d) The trial court's dismissal of defendants C. A. Vanderberg and Catherine Gillespie has not been attacked by plaintiff, and this portion of the trial court's judgment is therefore affirmed, as is that portion of the trial court's judgment that the plaintiff W. I. Davis recover the title to and the possession of the tract of land upon the Hughes Survey which is described in said judgment.

(e) It is ordered that plaintiff recover all costs, in this court and in the trial court, of the defendants Haslam Lumber Company, Inc., and W. C. Garrett.